Johnston, Ch.
delivered the opinion of the court.
It is stated that the deed of Wiley Freeman was executed in April, 1821; and that the slaves conveyed by it, remained in his possession until 1835; when a bill was filed by his wife and children, (the beneficiaries under the deed,) for the appointment of a trustee, to preserve and protect their interests. This suit was brought to a hearing in January, 1836. It is stated that, at that time, Wiley Freeman, the donor, was much embarrassed: and, indeed, considered insolvent. Among other debts for which he was liable, was a note given by him to the defendant, James Tompkins, as executor of Samu*el Tompkins, for $238; which fell due the 15th of February, 1832. To this note, one Pleasant Searles and another person, were sureties. ' Searles, hearing that an application was about to be made to establish a trust in relation to these slaves, raised an objection on account of their liability for the note referred to. Mrs. Freeman told him, that if he would withdraw his objection, she would save him harmless, out of the trust property. He then called on the defendant, who, as executor of Samuel Tompkins, held the note, to know if Mrs. Freeman had made any arrangement in conformity with her promise; and learned from him that, at her suggestion, he was to release him from the debt. Being satisfied with this arrangement, he withdrew his objections; and at January sittings, 1836,-the court declared a trust in favor of the wife. and children, under the deed, and appointed Stephen Tompkins trustee; to whom the defendant subsequently succeeded.
It appears to the court, that if the note was taken by the executor of Samuel Tompkins, or given by Searles, without notice of the deed, it constituted a charge upon the property, which was then in the hands of the donor: and that the release of, the debt, which was made in order to support the deed, is a good consideration to charge the trust estate. Any expenditure made for the benefit of a .trust estate, constitutes a good claim against it, to the extent of the benefit conferred; and surely that must be in the nature of a beneficial advancement which removes incumbrances, without the removal of which) the trust estate would not be allowed to exist.
We do not put the case on the agreement of Mrs. Freeman. The Chancellor rightly decided, that she was not competent to create a charge on the estate. But we take the removal of an existing incumbrance to be a ground for reimbursing the party removing it, out of the fund thus exhonerated. This is a ground which seems to have been overlooked on the circuit; and the case is sent back to the Com *57 missioner, that it may appear whether the debt released was, in. fact, contracted with or without notice of the deed; upon which depends the question, whether it was or was not a charge on the property conveyed.
On the other question presented, (whether the hire of the slaves for the year in which Mrs. Freeman, the life tenant, died, should be apportioned,) we concur with the Chancellor. His decree, on this point, was made without having before him the precise terms of the order of reference made by myself in June, 1843; and there appears to be a conflict between his decree and the order. But the appeal opens the order of reference to our examination: and we are satisfied it was erroneous in allowing to the estate of the life tenant, the hire accruing after her death, in May, 1837.
The order of reference was made upon the authority of Leverett vs. Leverett, 2 McC. Ch. 84; the correctness of which I have always questioned, although I felt bound by it.
The Act of 1789, (Pub. Laws, 494,) declares: — “ If any person shall die after the 1st. day of March, in any year, the slaves of which he or she was possessed, whether held for life or absolutely, and who were employed m making a crop, shall be continued on the lands, which were in the occupation of the deceased, until the crop is finished; and then be delivered to those who have the right to them: and such crop shall be assets in the executor’s or administrator’s hands, subject to the debts, legacies and distribution, (the taxes, overseer’s wages, expenses of physic, food and clothing, being first paid); and the emblements of the lands which shall be severed before the last day of December, following, shall, in like manner, be assets in the hands of the executor or administrator ; but all such emblements, growing on the lands on that day, (or at the time of the testator’s or intestate’s death — if that happens after the said last day of December, and before the first day of March,) shall pass with the lands. And if any person shall rent or hire lands or slaves, of a tenant for life, and such tenant for life dies, the person hiring such land or slaves, shall not be dispossessed until the crop of that year is finished, he or she securing the rent or hire when due.”
This Act seems to contemplate several cases :—
1. Where the decedant is absolutely entitled to the slaves and lands in his possession. In this case, if he die after the 1 st of March, being employed at the time in making a crop, his arrangements shall not be changed, but pursued “until the crop is finished.” So much of the crop as shall be gathered, or of the emblements as shall be severed, before the last of *58 December, shall go as assets to the executor; but on that day the slaves and the land (with the emblements then on it) shall pass and be given up to those entitled to them by-distribution, or under the decedant’s will.
2. Where slaves, held by the decedant for life, are engaged in raising a crop upon lands owned by him absolutely, or in fee, the slaves shall not be removed by the remainderman, till the crop is finished. They are then to be delivered to him. As to the crop, it is to be disposed of as in the other case. This seems to be the case more particularly contemplated by the first portion of the enactment recited.
3. The third case is, where both lands and negroes are held for life. Here the crop and emblements gathered before the end of the year, shall go as assets to the executor of the life tenant; but the slaves and land, with the remaining emblements, shall be delivered to the remainderman at the end of the year.
All these are cases in which the slaves and land are in the hands of the life tenant, and employed by him in planting.
4. The fourth case is where the life tenant has rented or hired the land or slaves to another, who employs them in planting. In that case it is declared, that the hirer’s possession shall not be disturbed until the crop is finished; provided he “ secure the payment of the rent or hire, when due.” This is the case particularly referred to in the last sentence in the enactment.
This last clause, I think, furnishes the clue to the whole statute.
There is no division of opinion in this: — that when the Act says the hirer shall secure the payment of the rent and hire, it means that he shall secure to the remainderman the proportion of it which arises after the accrual of the remainder. The proportion arising in the term of the life tenant is already secured to him by the contract of hiring.
There is as little doubt that the hirer is entitled to the crop and emblements gathered before the last of the year ; and that the emblements then remaining, as well as the land and slaves, go to the remainderman at the end of the year.
In this case, the assignee of the tenant for life takes the emblements and crop, but pays the remainderman his portion of the hire of the property.
Is it reasonable to suppose that the Act intended to give them (the emblements and crop) to the estate of the life tenant upon different terms? That what is required of the assignee, is not also required of the executor of the assignee ? That if the life tenant happens to retain the property in his own hands, his executor shall take the property without *59 compensation to the remainderman, but if he chances to assign it, it is liable to other creditors ?
This can hardly be supposed, without some strong necessity, or unless we are compelled to such a construction by terms in the statute admitting of no other. The objects of the Act are plain and palpable, and lead to no such consequences.
It is plain that the Legislature looked to the injury which would result, from interrupting the planting operations after that season when preparations for the crop are usually in progress ; and intended to -secure against the consequences of a sudden change of the right of property by the death of the party, in faith of whose title the crop was set. As a matter of convenience it was provided that, in all cases where the crop was superintended by the executor of the decedant, it should constitute assets in .his hands. But it by no means follows, that when it is raised by means of slaves or lands which, on the death of his testator, become the property of a remainderman, these shall be used without compensation. Certainly the Act does not “ continue the estate of the life tenant,” as it is expressed in Leverett vs. Leverett, “ to the end of the year.” There can be no doubt that if it were necessary to vindicate the title to the property, (the land for instance,) the suit must be brought in the name of the remainderman.
The only object of the statute was, to prevent great injury from the loss of a crop planted, and to obviate the difficulty of employing laborers after the beginning of the planting season. This is an essential benefit to the estate of the life tenant; though that estate, into whose service the remainderman’s property is pressed, should be compelled to pay an equivalent for the services rendered. And it is no greater hardship that the life tenant’s estate should pay for these services than a person to whom he hires the property:— which is expressly provided for in the statute.
It is not necessary, however, in this case, to decide any thing in relation to the case where the life tenant dies in the possession of the property. And my remarks on Leverett vs. Leverett, are not intended to commit the court on that point. My own impression is, that the rule should be uniform, whether the life tenant, or another under him, be in posses•sion at the life tenant’s death; but the court desires to reserve its opinion on that subject.
But the court is of opinion that the case before us falls under the last clause of the statute, and that the hire of the slaves should be apportioned according to the decree.
*60 The case quoted by counsel, of Percival vs. Herbemont, (1 McMul. Rep. 59,) which decides that slaves not employed in planting, either by the life tenant or his bailee, are not within the Act of 1789, has nothing to do with a case like this, where the slaves were hired for plantation work.
It is ordered that the case be remanded to the circuit court: and that the report be opened and the accounts referred again to the Commissioner, with the instructions contained in this opinion.
Johnson, Ch. concurred.
Dunkin, Ch.
I think Leverett vs. Leverett is a correct exposition of the Act of 1789; but I do not consider this case as falling within the provisions of that Act, but as governed by Percival vs. Herbemont, 1 McMul. 59.
Harper, Ch. absent at the hearing.

Order modified.